UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT JOINER, )
 )
    Plaintiff, )
 )
  vs. ) Case No. 4:13-CV-1303 (CEJ)
 )
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
 )
    Defendant. )

## **MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. **Procedural History**

On April 2, 2010, plaintiff Robert Joiner filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of March 29, 2009. (Tr. 150-53). After plaintiff's applications were denied on initial consideration (Tr. 74-78), he requested a hearing from an Administrative Law Judge (ALJ). (Tr.79-80).

Plaintiff and counsel appeared for a hearing on February 1, 2012. (Tr. 31-72). The ALJ issued a decision denying plaintiff's applications on February 21, 2012. (Tr. 9-30). The Appeals Council denied plaintiff's request for review on May 8, 2013. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

### II. **Evidence Before the ALJ**

### A. **Disability Application Documents**

In his Disability Report (Tr. 167-76), plaintiff listed his disabling conditions as low reading skills, trouble with his right leg, difficulty walking, right arm weakness, dizziness, and mitral valve prolapse. He stated that he stopped working on December

31, 2006, to stay home and take care of his children. He had held positions as a bus boy, dishwasher, pizza cook, short-order cook, and a laborer. He reported that he had attended a "special transitional school" because he was hyperactive and had learning disabilities. (Tr. 176).

Plaintiff completed a Function Report. (Tr. 185-95). He stated that he spent his waking hours trying to "make the best of the day" and "stay mobile." When asked how his conditions affected his abilities, plaintiff stated that he found it difficult to run, fall asleep, and bathe and shave. He did not prepare his own meals or do chores. He was able to drive on his own and shop in stores. He spent time with others watching movies and eating. He identified his areas of difficulty as lifting, squatting, bending, standing, walking, kneeling, stair climbing, seeing, understanding, following instructions and memory. He was able to walk for about 5 minutes before needing to rest.

Plaintiff's mother completed a Third-Party Function Report. (Tr. 177-84). She reported that plaintiff lived at home with his family. His daily activities included showering, checking the mail, watching television, and completing some household chores, such as washing dishes, doing laundry, and taking out the trash. He prepared simple meals and shopped for his own groceries and personal items. He could pay bills, count change, and handle bank accounts. His hobbies included watching television, using the computer, and going outside. He liked to spend time with others and visited his grandmother once a week. He did not follow written instructions very well and could follow simple spoken instructions. He did not handle stress well but managed changes in routine. In addition to the problem areas identified by plaintiff, Mrs. Joiner stated that her son had difficulty with talking, completing tasks,

concentration, and completing tasks.  She believed plaintiff could lift 25 pounds and walk for 100 yards before needing a rest.  She noted that he had dizziness when rising and standing too long, short-term memory problems, right-side weakness, and a lisp.  He needed help with reading, spelling, and remembering multiple instructions.

### B. Hearing on February 1, 2012

Plaintiff was 34 years old at the time of the hearing.  (Tr. 36).  He lived in a mobile home with his mother, her boyfriend, and his older sister.  When he was in school he received special education services, and he completed the twelfth grade.  He had no vocational training.

Plaintiff testified that he most recently worked operating a machine in a cookie factory during the summer of 2011.  (Tr. 38).  The factory stopped giving him hours after his third accident, when he banged his head on one of the machines and got a concussion.  (Tr. 60).  Plaintiff's last full-time position was seven months on a production line in Kentucky about seven years before the hearing.  (Tr. 39).  That job ended when the "temporary company" terminated him without explanation. Within the prior 15 years, plaintiff had also held full-time positions as a kitchen worker, dishwasher, and bus boy.  (Tr. 41).

Plaintiff testified that he had a swollen vessel in the right side of his brain.  (Tr. 42).  This caused dizziness, an inability to concentrate, difficulty balancing, and weakness in his right arm.  (Tr. 42-43).  He could not remember verbal instructions and struggled with spelling.  (Tr. 62). He had a twitching sensation in the back of his right knee which became more pronounced if he sat or stood for too long.  (Tr. 64-65). He had migraine headaches, but they were not as bad as they had been in the past. (Tr. 43).  He was not presently under a doctor's care but was on a waiting list at the

local health care center. He could not recall what medications he was taking. His last doctor had not restricted his activities. (Tr. 44). Plaintiff thought he could safely lift 10 to 15 pounds and could sit or stand for 10 to 15 minutes at a time. (Tr. 54-56). Although he had a driver's license, he had last driven about three and a half years earlier.

Plaintiff testified that he had learning problems and depression and found it difficult to talk to people. These conditions made it difficult for him to keep a job, he stated, because he couldn't keep his focus and got "tired of it and just wanted to move on." (Tr. 51). He stated that he had always struggled with feeling like he needed to "get out of" places. He occasionally had difficulties with supervisors and coworkers. He found it difficult to adjust when from one task to another. He used to drink a fifth of scotch once or twice a month, but he stopped drinking in 2004 when his son was born. (Tr. 57-58). He was once hospitalized after a relationship ended and he was depressed and agitated. (Tr. 62-63).

Plaintiff testified that he usually got up between 7:00 and 8:00 in the morning. His mother made him breakfast and he watched television for a few minutes. He then showered and dressed before returning to watch television for 20 minutes or so. He then did household chores until 11:00 or 12:00, when he took a nap for two or three hours. When he woke up, he watched television, or played video games or called his children in Kentucky. If asked, he helped to prepare dinner. After dinner, he watched television again before going to bed at 9:00 or 10:00.

With respect to his personal care, plaintiff testified he sometimes became dizzy while showering and had difficulty focusing his eyes while shaving. He went grocery shopping, washed dishes, did his own laundry, and swept and vacuumed the floors.

(Tr. 49). He sometimes walked around the trailer park with his sister if she asked, but he had to take a break after about five minutes. (Tr. 54). He visited with relatives about once a week. He had not seen his children in two years. (Tr. 52).

James Breen, M.S., a vocational expert, testified that plaintiff's past work as a dishwasher was classified as medium and unskilled; the fast-food position was light and unskilled; and the production position was heavy and unskilled. (Tr. 66). The ALJ asked Mr. Breen regarding the employment opportunities for an individual of plaintiff's age, education, and work experience, who was limited to unskilled work without strict time or production requirements; involving no more than superficial contact with the public and coworkers; and no more than occasional changes in the work environment. In addition, Mr. Breen was asked to assume that the individual could never climb ladders, ropes, or scaffolds; only occasionally climb ramps and stairs; could frequently balance, stoop, kneel, crouch, and crawl; and had to avoid concentrated exposure to hazards. Mr. Breen testified that such an individual would be able to perform plaintiff's past work as a dishwasher; in addition, the individual would be able to work as a janitor, a warehouse worker, or hand packager. However, an individual who suffered from dizziness, required naps every day, and easily lost concentration would be precluded from employment. Employers in the unskilled job market would typically tolerate 10 to 12 absences a year and would expect employees to be on task about 90 percent of the work day.

### C. Records

The Special School District of St. Louis County diagnosed plaintiff as learning and language disabled. (Tr. 221-30). In January 2006, when he was in 11th grade, plaintiff was suspended for 6 days for making a verbal threat toward staff, using

-5-

obscenity, demonstrating a lack of respect, and disrupting class. (Tr. 227). In March 1996, plaintiff was described as displaying 20 different inappropriate behaviors on an hourly basis "[d]espite all behavior management techniques and consultations. . . Valid evaluation of his skills is difficult due to his refusal to do almost any tasks." (Tr. 263). In December 1997, plaintiff was described as an auditory listener who retained "a good amount" of the information he heard. (Tr. 238). Plaintiff was about to age out of special education services and was referred to Vocational Rehabilitation. (Tr. 239). It was noted that plaintiff had a mitral valve prolapse which limited his physical activities. (Tr. 237) see also Tr. 250 (note on form dated Mar. 15, 1996 states: "Robert has just undergone surgical procedure to improve his heart condition . . . He has been taken off his heart medication).

    The medical records begin in 2003, with plaintiff's care at the Jennie Stuart Medical Center, in Hopkinsville, Kentucky. Plaintiff frequently presented to the emergency room or outpatient clinic with complaints of migraine headache (Tr. 314, 332, 352, 359, 582, 591, 594, 633, 637, 641, 648, 655, 657, 661, 671, 679, 682, 721, 723); toothache (Tr. 324, 476, 486, 495, 504, 514, 547, 552, 554, 721); low back pain (Tr, 574, 582, 591, 637, 657, 661, 664, 671, 679, 715, 723); injuries sustained as a result of overuse (e.g., Tr. at 557, back pain after moving furniture; Tr. at 611, shoulder pain from lifting shingles) or household accidents (e.g., Tr. at 706, fractured right wrist in fall; Tr. 677, twisted ankle slipping on ice; Tr. at 537 and 522, twice injured falling down steps); and joint pain following a car accident (Tr. 574, 569). Plaintiff frequently left the health center before receiving treatment (e.g., Tr. 385, 534).

On February 12, 2009, plaintiff was admitted for inpatient psychiatric treatment after he made threats to harm himself or his girlfriend when she moved out of the family home with their two children. (Tr. 270-80). At intake, plaintiff denied experiencing mania or hallucinations and reported that he was not suicidal or homicidal. He described himself as a nervous person who kept to himself and became anxious around other people. He had not worked for two years and stayed home to raise the children. He had significant learning disabilities and was unable to spell or do simple calculations. (Tr. 271). His speech was clear, his thoughts were coherent, and his mood was depressed and anxious. (Tr. 272). His impulse control during the intake interview was fair. At admission, plaintiff's principal diagnosis was mood disorder, not otherwise specified; ancillary diagnoses included learning disorder and adjustment disorder. His Global Assessment of Functioning (GAF)[1] score was 30.[2] (Tr. 273). Plaintiff was discharged four days after admission, making a "rapid recovery" after arranging with his girlfriend to see his children whenever he wanted. (Tr. 279-80). It was learned during his admission that plaintiff was abusing the medication Lortab. His girlfriend was willing to consider reconciling if plaintiff stayed away from Lortab and

---

[1]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[2]A GAF of 21-30 corresponds with "[b]ehavior . . . considerably influenced by delusions or hallucinations OR serious impairment in communications or judgment OR inability to function in all areas." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

got a proper job. He was discharged with prescriptions for Celexa and Ambien. (Tr. 280). At discharge, his mood was good and his affect was bright and pleasant.

On March 29, 2009, plaintiff was transported by ambulance to the emergency room, for a possible seizure. (Tr. 284). He reported that he had shaking in his arms and legs. Diagnostic imaging tests revealed no acute intracranial or cardiopulmonary processes. (Tr. 293-94). Plaintiff returned to the emergency room on March 30, 2009, with complaints of migraine headache. (Tr. 352). In April 2009, plaintiff again sought treatment for a headache but left before he was seen. (Tr. 359-61).

On June 14, 2009, plaintiff presented at the emergency room and stated that he had swelling in his right arm and leg, dizziness, and light-headedness. He left before he could be seen, and returned a week later with similar complaints. (Tr. 363-64, 369). In addition, he stated that he became "wobbly" when he stood for too long. Imaging studies disclosed no evidence of acute intracranial or cardiopulmonary conditions. (Tr. 375-76). On August 19, 2009, plaintiff again complained of dizziness and pain in his right leg. He also reported that he had had bleeding from his left ear. (Tr. 385-86). He left without treatment.

On March 17, 2010, Karen MacDonald, Psy.D., conducted a clinical psychological evaluation of plaintiff at the request of the Lincoln County (Missouri) Family Support Division. (Tr. 397-04). Plaintiff reported that he had a seizure or stroke, in which his eyes rolled back in his head. He stated that he had trouble with his right side thereafter and he moved back to his mother's home in Missouri to "get some help." He acknowledged a past addiction to pain medication and two periods of incarceration due to substance abuse problems. He also reported that he made a suicide attempt in his early twenties. He suffered from migraine headaches for which he was not

taking any medication at the time of the evaluation. Plaintiff's daily activities included helping with household chores, doing his laundry, and running errands for his mother. He had difficulty falling asleep due to what is described as "a great deal of tension in his right leg." (Tr. 398).

Dr. MacDonald described plaintiff as cooperative and able to relate without difficulty, with good eye contact. She noted that his speech was "somewhat difficult," which he attributed to the seizure or stroke that occurred in 2009. Plaintiff was oriented to all four spheres, without evidence of thought disorder, though he appeared to be experiencing mood swings. Dr. MacDonald also noted that plaintiff had impairments in attention, concentration, and perceptual motor speed. Plaintiff's score of 28 on the Mini Mental Status Examination, Second Edition (MMSE-2) reflected impairment in cognitive ability. (Tr. 398).

In her summary, Dr. MacDonald described plaintiff as "a 32-year old single male who reflects moods swings associated with a possible seizure or stroke." His learning disabilities were evident: for example, he did not know how many weeks there are in a year, could perform only simple addition, and did not know the day of the week or the date. He had feelings of helplessness, hopelessness, worthlessness, and a past suicide attempt. He showed impairments of visual-spatial ability, incidental learning, motor speed, and memory functions, which she described as "severely impaired."[3] Plaintiff's diagnoses included major depressive disorder, recurrent, severe; mood disorder due to possible stroke or seizure; polysubstance dependence in remission; learning disorder, not otherwise specified; and impairment in cognitive ability. She

---

[3]He could not recall three words presented earlier and gave only 3 out of 25 acceptable responses in a "story memory task."

assigned a GAF score of 40[4] and opined that it was questionable whether plaintiff could manage his own funds. (Tr. 398-99).

Plaintiff was first seen by Michelle Neblock, M.D., on May 7, 2010. (Tr. 434-36). Plaintiff complained of ongoing tightness in his right knee and dizziness. He reported that his symptoms began on March 30, 2009, when his leg started "jumping," with tingling and pulling sensations. Although he sought medical care at the time, he left against medical advice and had not had any treatment since. His symptoms improved somewhat with brief walking. Plaintiff described his dizziness as "like my eyes are wobbling in my head" and explained that "the bump on the back of my head gets bigger" and the dizziness begins. He also reported that it felt as though something in his neck "snapped." (Tr. 435). On examination, Dr. Neblock observed that plaintiff had a normal gait with no effusion, redness or warmth. He displayed intact strength in all extremities. X-rays of the cervical spine showed straightening of the cervical lordosis and mild scoliosis of the upper thoracic spine. (Tr. 442). An x-ray of the right knee was unremarkable. (Tr. 441).

On June 25, 2010, Stanley Hutson, M.D., completed a Psychiatric Review Technique. (Tr. 405-16). Dr. Hutson concluded that plaintiff had medically determinable diagnoses of learning disorder not otherwise specified, major depressive disorder, mood disorder not otherwise specified, and polysubstance dependence in remission. Dr. Hutson noted that plaintiff's IQ was in the borderline to low average range of intellectual functioning. Plaintiff had moderate difficulties in maintaining

---

[4]A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

concentration, persistence or pace and mild restrictions of daily living activities and maintaining social functioning. In a narrative section, Dr. Hutson noted that plaintiff's credibility was "difficult to determine but he has allegations that are not supported" and he had "not been compliant with treatment at times." Dr. Hutson noted that plaintiff claimed disability from March 29, 2009, when he claimed to have had a seizure or stroke, but there was no confirmation in the medical record of such an event. His only mental health treatment was his hospitalization in 2009, which Dr. Hutson characterized as "seem[ing] manipulative." Plaintiff was not taking any psychotropic medications and had not been treated in more than a year. Dr. Hutson noted that Dr. MacDonald's evaluation had more severe limitations than any other evidence in the record. (Tr. 416).

Dr. Hutson also completed a Mental Residual Functional Capacity Assessment. (Tr. 417-19). He found that plaintiff was moderately limited in the abilities to understand, remember, and carry out detained instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers and peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. Dr. Hutson noted that plaintiff had worked in restaurant positions and opined that plaintiff was able to understand and follow simple instructions and remember work procedures. Furthermore, he was able to be appropriate in low conflict social interactions and was capable of coping with a low stress work setting. (Tr. 419).

Also on June 25, 2010, a Physical Residual Functional Capacity Assessment (PRFCA) was completed by Julie Kujath, a single decisionmaker.[5] (Tr. 420-24). Ms. Kujath found that plaintiff had no exertional, manipulative, visual, or communicative limitations. He should only occasionally climb ramps or stairs, and never climb ladders, ropes or scaffolds, and should avoid concentrated exposure to hazards.

Plaintiff returned to Dr. Neblock in October 2010. (Tr. 427-29). He reported that his knee pain had improved but then recurred in August, with the pain worse at night. He displayed no abnormality of gait and had full range of motion. He also complained of weakness in his right arm but he had full strength on examination. An MRI of the right knee showed a small well-defined fluid collection, likely to be a ganglion cyst. (Tr. 440).

In October 2010, plaintiff was evaluated at the neurology clinic at Barnes Jewish Hospital. (Tr. 452-61). He reported that he had committed himself to a facility to stop using pain pills and treat his depression. When he was discharged in November 2008, he felt "weird in the head, not normal." He took antidepressants for a time but stopped when he felt better. He explained that, in March 2009, he had an episode where he "jumped off the toilet [and] when he sat down . . . his right leg was feeling funny. He then tried to stand up [but] felt as if his leg was not there and [it] was jumping on its own and he could not stop it." (Tr. 458). He fell on the floor and his leg continued to jump for 10 minutes. He felt something snap in the back of his head. He believes he lost consciousness. He had milder "spells" when stressed or upset.

---

[5]Missouri is one of 20 states in which nonmedical disability examiners are authorized to make certain initial determinations without requiring a medical or psychological consultant's signature. See Office of the Inspector General, Audit Report Single Decisionmaker Model – Authority to Make Certain Disability Determinations without a Medical Consultant's Signature (Aug. 2013).

On examination, plaintiff displayed fluent speech and his reading and writing were intact. He was alert and oriented, he had full recall and memory, and he performed well when asked to list the months backwards, name presidents, and do calculations. (Tr. 459). He had full strength on his left side, with mild weakness on his right side. He displayed no tremor and sensation was intact. His coordination, gait, stance, and reflexes were all normal. Plaintiff was assessed as having right hemiparesis of unknown etiology, spells of unknown etiology, and migraines. (Tr. 460). An EEG disclosed no abnormalities. (Tr. 446). An MRI of the brain and brain stem produced no findings to explain possible seizure activity. There was a "possible developmental venous anomaly within the right frontal lobe" and fluid in some left mastoid air cells. (Tr. 448-49).

The court transcript contains no records of any followup treatment with either Dr. Neblock or Barnes Jewish Hospital. In August and September 2011, plaintiff sought medical care at the Lincoln County Medical Center for treatment of on-the-job injuries. (Tr. 750-52). Plaintiff had a CT scan of the head in September 2011 after hitting the top of his head at work. (Tr. 752, 754). There was no indication of acute intracranial abnormality.

W. Clayton Davis, M.A., completed an evaluation of plaintiff on November 7, 2011. (Tr. 755-58). Mr. Davis administered the Patient Health Questionnaire-9 (PHQ-9), the Blessed Orientation Memory Concentration Test (BOMC), and a Mini Mental Status Examination (MMSE). Mr. Davis reported that plaintiff's score on the PHQ-9 was indicative of moderate depression. On the BOMC, plaintiff missed items such as the current date, recall, and counting backwards, which demonstrated difficulty with concentration. And, on the MMSE, he missed items that assess attention and delayed

verbal recall. Mr. Davis diagnosed plaintiff with major depression and assigned a GAF of 45.[6] He recommended that plaintiff seek psychiatric treatment of his depressive symptoms, and undergo assessment and treatment of his cognitive impairment. He opined that plaintiff would not be a candidate to seek and maintain employment due to his depressive symptoms and cognitive difficulties with concentration and attention span.

Mr. Davis completed a Mental Residual Functional Capacity Questionnaire. (Tr. 759-66). He opined that plaintiff's highest GAF in the prior year was 50, that his impairment were expected to last over 12 months, and that he was not a malingerer. Mr. Davis indicated plaintiff displayed the following symptoms and signs: decreased energy, difficulty thinking or concentrating, easy distractability, emotional withdrawal or isolation, impairment in impulse control, and memory impairment. He stated that plaintiff did not have a low IQ or reduced intellectual functioning. With respect to plaintiff's ability to sustain mental activity in a normal competitive work environment, Mr. Davis found that plaintiff had marked or extreme limitations in three out of three mental activities related to understanding and memory; eight out of eight activities related to concentration and persistence; and five out of five activities related to adaptation. Plaintiff had moderate impairments in three areas and marked impairments in two areas of social interaction. Plaintiff was likely to require one unscheduled break every two hours and to miss more than four days per month.

### III. The ALJ's Decision

---

[6] A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

In the decision issued on February 21, 2012, the ALJ made the following findings:

1. Plaintiff has not engaged in substantial gainful activity since March 23, 2010, the application date.

2. Plaintiff has the following severe impairments: migraines, learning disorder, major depressive disorder, adjustment disorder, right knee ganglion cyst, and polysubstance dependence in remission.

3. Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: he is limited to unskilled work without strict time or production requirements; with no more than superficial contact with the public and coworkers; and no more than occasional changes in the work environment. He cannot climbing ladders, ropes or scaffolds; can occasionally climb stairs and ramps; frequently balance, stoop, kneeling, crouch and crawl; and must avoid of concentrated exposure to hazards.

5. Plaintiff is able to perform his past relevant work as a dishwasher.

6. Plaintiff has not been under a disability, as defined in the Social Security Act, since March 23, 2010, the date he filed his application.

(Tr. 14-26).

### IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions

represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184,

*2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he

cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ erred in failing to consider the opinion of consultative examiner W. Clayton Davis. Defendant acknowledges the ALJ's omission, but suggests that it amounts to no more than harmless error.

As a counselor, Mr. Davis is not an "acceptable medical source" under 20 C.F.R. § 404.1513(a), but he can be considered an "other source" under 20 C.F.R. § 404.1513(d). An ALJ is not required to treat the opinions of an "other source" with the same level of deference as the opinions of acceptable medical sources. See Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006) (in considering the opinion of social worker, ALJ was not bound by treating source regulations but had "more discretion" and was "permitted to consider any inconsistencies found within the record.") (citations omitted). Nonetheless, the opinions of other sources may be used to show the severity of a claimant's impairments and ability to work, § 404.1513(d), and should not be ignored. Koschnitzke v. Barnhart, 293 F. Supp. 2d 943, 950 (E.D. Wis. 2003).

-18-

Under Social Security Ruling 06-3P, the ALJ "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence . . . allows . . . a subsequent reviewer to follow the adjudicator's reasoning." S.S.R. 06-3P, 2006 WL 2329939 at *6; see also Lassley v. Apfel, No. 99–35685, 2000 WL 1768132, at *1 (9th Cir. Nov. 29, 2000) (ALJ may accord opinion of "other source" less weight than that of an acceptable medical source, but should provide "sufficient reasons" for rejecting it); Carter v. Apfel, 220 F. Supp. 2d 393, 397 (M.D. Pa. 2000) (reversing where ALJ failed to discuss records of other medical source); Falcon v. Apfel, 88 F. Supp. 2d 87, 90 (W.D.N.Y. 2000) (although "other source" is not considered "treating source," whose opinion may be entitled to controlling weight, opinion must be given at least some consideration); cf. Strongson v. Barnhart, 361 F.3d 1066, 1071 (8th Cir. 2004) (it is improper for ALJ to ignore opinion evidence from therapist that is in the record and provides unique uncontroverted evidence of an impairment). Although a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency had no practical effect on the outcome of the case, the ALJ is not free to ignore medical evidence but rather must consider the whole record. Reeder v. Apfel, 214 F.3d 984, 988 (8th Cir. 2000) (ALJ erred by ignoring opinion of consulting mental health examiner). In this case, the ALJ failed to mention Mr. Davis's report. It is not possible to determine whether the ALJ's omission was inadvertent or reflected a reasoned determination that the report was entitled to no weight, and the Court has no choice but to remand the matter for further consideration.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2014.